SUPREME COURT OF ARIZONA

| | |
|---|---|
| SCOTTSDALE HEALTHCARE, INC., dba ) SCOTTSDALE HEALTHCARE – OSBORN,  )<br>                                  )<br>           Plaintiff-Appellee,)<br>                                  )<br>                  v.              )<br>                                  )<br>ARIZONA HEALTH CARE COST          )<br>CONTAINMENT SYSTEM                )<br>ADMINISTRATION, an agency of the )<br>State of Arizona; and PHYLLIS     )<br>BIEDESS, in her capacity as       )<br>Director,                         )<br>                                  )<br>           Defendants-Appellants.)<br>                                  )<br>―――――――――――――――――――――――――――――――    )<br>BANNER HEALTH SYSTEM, a North     )<br>Dakota non-profit corporation,    )<br>dba GOOD SAMARITAN REGIONAL       )<br>MEDICAL CENTER,                   )<br>                                  )<br>           Plaintiff-Appellee,)<br>                                  )<br>                  v.              )<br>                                  )<br>ARIZONA HEALTH CARE COST          )<br>CONTAINMENT SYSTEM                )<br>ADMINISTRATION, an agency of the )<br>State of Arizona; and PHYLLIS     )<br>BIEDESS, in her capacity as       )<br>Director,                         )<br>                                  )<br>           Defendants-Appellants.)<br>                                  )<br>―――――――――――――――――――――――――――――――    )<br>BANNER HEALTH SYSTEM, a North     )<br>Dakota non-profit corporation,    )<br>dba GOOD SAMARITAN REGIONAL       )<br>MEDICAL CENTER,                   )<br>                                  )<br>           Plaintiff-Appellee,)<br>                                  )<br>                  v.              )<br>                                  )<br>ARIZONA HEALTH CARE COST          )<br>CONTAINMENT SYSTEM                )<br>CONTAINMENT SYSTEM                ) | Arizona Supreme Court<br>No. CV-02-0190-PR<br><br>Court of Appeals<br>Division One<br>No. 1 CA-CV 01-0226<br><br>Maricopa County<br>Superior Court<br>No. CV 98-022481<br><br>Consolidated with:<br><br><br><br><br><br><br><br>Arizona Supreme Court<br>No. CV-02-0218-PR<br><br>Court of Appeals<br>Division One<br>No. 1 CA-CV 01-0380<br><br>Maricopa County<br>Superior Court<br>No. CV 99-21939<br><br><br><br><br><br><br><br>Arizona Supreme Court<br>No. CV-02-0220-PR<br><br>Court of Appeals<br>Division One<br>No. 1 CA-CV 01-0468<br><br>Maricopa County<br>Superior Court<br>No. CV 99-019370 |

ADMINISTRATION, an agency of the )
State of Arizona; and PHYLLIS )
BIEDESS, in her capacity as ) **O P I N I O N**
Director, )
 )
              Defendants-Appellants.)
————————————————————————— )

Appeals from the Superior Court in Maricopa County,
No. CV 98-022481, The Honorable Joseph B. Heilman, Judge, and The
Honorable Mark R. Santana, Judge
No. CV 99-21939, The Honorable Mark R. Santana, Judge
No. CV 99-019370, The Honorable Paul A. Katz, Judge, and
The Honorable F. Pendleton Gaines, III, Judge
**REMANDED**

Court of Appeals – Division One,
202 Ariz. 365, 45 P.3d 688 (2002)
1 CA-CV 01-0380 (May 30, 2002) (mem. decision)
1 CA-CV 01-0468 (Jun. 4, 2002) (mem. decision)
**VACATED**

---

GAMMAGE & BURNHAM, P.L.C                                        Phoenix
     By Richard B. Burnham, Cameron C. Artigue,
     Susan L. Watchman and Aaron C. Schepler
Attorneys for Consolidated Plaintiffs-Appellees

JOHNSTON & KELLY, P.L.C.                                        Phoenix
     By Logan T. Johnston
Attorney for Defendants-Appellants

---

**R Y A N**, Justice

¶1       Undocumented aliens are eligible for publicly funded
medical coverage only for an emergency medical condition. *See*
Ariz. Rev. Stat. ("A.R.S.") § 36-2905.05(A) (Supp. 1997).[1]  If a

---

        [1]    Section 36-2905.05 was repealed in 2001 and replaced by
A.R.S. sections 36-2901.06, -2903.03 (2003).  The new statute
applies only to cases arising on or after October 1, 2001.  Because
these cases arose before that date we refer to the prior statute.
With respect to the issue in this case, the statutory amendments

2

hospital provides medical treatment for the emergency medical condition of an undocumented alien, the Arizona Health Care Cost Containment System ("AHCCCS") will reimburse the hospital for the costs of the care. A.R.S. § 36-2905.05 (Supp. 1997). The central question we must answer in this case is whether an undocumented alien's emergency medical condition has necessarily ended when the initial injury has been stabilized to the point of permitting the undocumented alien to be transferred from an acute care ward to a sub-acute care ward.

¶2 This matter involves three consolidated cases: *Scottsdale Healthcare, Inc. v. AHCCCS*, 202 Ariz. 365, 45 P.3d 688 (App. 2002); *Banner Health System v. AHCCCS*, 1 CA-CV 01-0380 (Ariz. App. May 30, 2002)(mem. decision)(*Banner I*); and *Banner Health System v. AHCCCS*, 1 CA-CV 01-0468 (Ariz. App. Jun. 4, 2002)(mem. decision)(*Banner II*). All three decisions reversed trial court rulings and upheld the AHCCCS Director's determinations that when the undocumented aliens were transferred from an acute care ward, they were not suffering from an emergency medical condition, and thus AHCCCS was not required to reimburse the hospitals for their continuing care after the transfer. The hospitals petitioned for review. We consolidated the three cases, *see* ARCAP 8(b), and granted review because of the statewide importance of this issue. We have

_____

effected no change in the law. *Compare* A.R.S. § 36-2905.05(A) (Supp. 1997), *with* A.R.S. § 36-2903.03(D) (2003).

jurisdiction under Article 6, Section 5(3), of the Arizona Constitution, A.R.S. section 12-120.24 (2003), and Rule 23 of the Arizona Rules of Civil Appellate Procedure.

**I.**

¶3        AHCCCS administers Arizona's Medicaid program in accordance with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396v (2001).  *See* A.R.S. §§ 36-2901 to -2958 (Supp. 1997) (superseded by A.R.S. §§ 36-2901 to -2975 (2003)).  Section 36-2905.05(A) provides that undocumented aliens are eligible for AHCCCS coverage "necessary to treat an emergency medical condition as defined in § 1903(v) of the [S]ocial [S]ecurity [A]ct."  In relevant part, § 1903(v) of the Social Security Act states the following:

> [T]he term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including extreme pain) such that the absence of immediate medical attention could reasonably be expected to result in–
>     (A) placing the patient's health in serious
>          jeopardy,
>     (B) serious impairment to bodily functions, or
>     (C) serious dysfunction of any bodily organ or
>          part.

*See* 42 U.S.C. § 1396b(V)(3) (2000) (codifying § 1903(v) of the Social Security Act).[2]

¶4        All the patients involved in these consolidated cases

---

[2]        For ease of reference, in the rest of the opinion we refer to this provision as "the statute" or "§ 1903(v)."

4

were undocumented aliens.  The injuries and treatment regimes for each of the five patients differed greatly.[3]  But the consistent thread through all three cases, in terms of interpreting § 1903(v), is that AHCCCS's denial of reimbursement to the hospitals coincided directly with the transfer of patients from an acute care ward to a rehabilitative type of ward.

¶5      After AHCCCS rejected the hospitals' grievances of the denials for reimbursement, hearings were held before administrative law judges to determine when each patient stopped receiving treatment for an emergency medical condition, thereby terminating AHCCCS's responsibility to reimburse the hospitals.  In *Scottsdale Healthcare*, the judge recommended that AHCCCS's denial of the hospital's grievance be sustained.  In *Banner I* and *Banner II*, the administrative law judges recommended that AHCCCS's denial of reimbursement be reversed in whole or in part.  In *Scottsdale Healthcare*, the AHCCCS Director adopted the recommendation denying

---

[3]      At the time of his transfer, the patient in *Scottsdale Healthcare*, J.N., was wearing a halo brace to support a surgical repair to two broken vertebrae in his neck and was unable to sit or stand on his own.  *Banner I* involved three patients:  P.F. was seriously injured in a car accident and when transferred had difficulty swallowing and had an impaired cough reflex which placed him at high risk for aspiration; J.M., when transferred, had to be fed through a feeding tube, had a tracheostomy, and received respiratory therapy every four hours; H.L., when transferred, was partially paralyzed, required a feeding tube, and had cognitive deficiencies.  In *Banner II,* G.O., as a result of a gunshot wound, had an open abdominal wound that required multiple surgeries to close.  He was transferred back and forth between acute care and rehabilitative care clinics.  He required a drainage tube and frequent dressing changes, and was at high risk for infection.

reimbursement; in *Banner I* and *Banner II*, the Director rejected the recommendations that the hospitals be reimbursed. The hospitals appealed to the superior court. The trial courts ruled in favor of the hospitals, and AHCCCS then appealed the three cases to the court of appeals.

¶6     The lead decision in the present matter is *Scottsdale Healthcare*. The court held that at the time coverage was denied the patient was not suffering from an "emergency medical condition" within the meaning of A.R.S. section 36-2905.05(A) and § 1903(v) of the Social Security Act. *Scottsdale Healthcare*, 202 Ariz. at 369, ¶ 10, 45 P.3d at 692. The two other cases consolidated for this opinion relied on *Scottsdale Healthcare*. *See Banner I,* slip op. at ¶ 9; *Banner II,* slip op. at ¶¶ 17-18.

## II.

¶7     The hospitals maintain that once a hospital admits an undocumented alien for treatment of an emergency medical condition, § 1903(v) requires AHCCCS to reimburse the hospital for the medical treatment provided to the undocumented alien until "the treating physician [has] a reasonable degree of confidence that the patient and his lay caregivers can manage his medical condition so that serious adverse consequences are not 'reasonably likely' to occur."

¶8     AHCCCS contends the evidence established that when transferred, the patients' conditions in these cases had stabilized, and thus they were not being treated for emergency

6

medical conditions.

¶9        There is no dispute that when the patients arrived at the respective hospitals each was suffering from an "emergency medical condition" within the meaning of § 1903(v). The question is whether each still suffered from an "emergency medical condition" at the time of their transfers from an acute care ward or bed. The answer to this question turns on the determination of when an emergency medical condition as defined by § 1903(v) ceases, and therefore AHCCCS's obligation to pay for medical treatment ends. Answering the question requires us to interpret the statute.

¶10        We review questions of law involving statutory interpretation *de novo*. *Forest Guardians v. Wells*, 201 Ariz. 255, 258-59, ¶ 9, 34 P.3d 364, 367-68 (2001) ("[I]f the administrative decision was based on an interpretation of law, it is reviewed *de novo*."). In interpreting a statute, we first look to the language of the statute itself. *Zamora v. Reinstein,* 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996). Our chief goal is to ascertain and give effect to the legislative intent. *Id.* The obvious intent of § 1903(v) is to limit publicly funded medical coverage for undocumented aliens to that necessary to treat "'emergency medical conditions' but not 'long-term care.'" *Mercy Healthcare Ariz., Inc. v. AHCCCS,* 181 Ariz. 95, 98, 887 P.2d 625, 628 (App. 1994).

¶11        Section 1903(v) has been characterized as "clearly defin[ing] the scope of coverage." *Id.* The statute has also been

7

characterized as "plain in its meaning." *Greenery Rehab. Group, Inc. v. Hammon,* 150 F.3d 226, 233 (2nd Cir. 1998). However, no bright line can be drawn as to what constitutes an emergency medical condition because "the unique combination of physical conditions and the patient's response to treatment are so varied that it is neither practical nor possible to define with more precision all those conditions which will be considered emergency medical conditions." *Eligibility of Aliens for Medicaid*, 55 Fed. Reg. 36,813, 36,816 (Sep. 7, 1990).

¶12    Before the court of appeals issued its lead decision in these cases, the courts in *Mercy Healthcare* and *Greenery* had grappled with what § 1903(v) meant by an emergency medical condition. We initially turn to *Mercy Healthcare*, the first decision to interpret the scope of the statute.

¶13    In *Mercy Healthcare*, the parties had taken positions similar to those taken by the parties here. The undocumented alien there had suffered a serious closed head injury. 181 Ariz. at 97, 887 P.2d at 627. After initial treatment at the hospital, the patient was transferred to a skilled nursing facility. *Id*. "At the time of transfer, [the patient] was non-verbal, could not move his lower extremities, had a gastrointestinal tube for feeding, and had a tracheostomy." *Id*. Mercy Healthcare contended that "if an undocumented alien initially suffers from an emergency medical condition, AHCCCS must cover the patient's treatment so long as the

8

emergency medical condition necessitates uninterrupted care." *Id.* at 98, 887 P.2d at 628. AHCCCS contended that its obligation to cover an undocumented alien's medical care ended when the patient's condition stabilized. *Id.*

¶14 The court of appeals rejected both positions. *Id.* The court held that the statute required a two-part test. *Id.*

> [T]he statute requires that the medical condition manifest itself by "an acute symptom (including severe pain)." The statute then mandates that AHCCCS must cover services for treatment of that medical condition so long as absence of immediate treatment for that condition "could reasonably be expected to result in" one of the three consequences defined by statute.

*Id.* at 99, 887 P.2d at 629 (citation omitted). The court expressly held that "the statute does not limit coverage to services for treatment while acute symptoms continue." *Id.* at 98-99, 887 P.2d at 628-29 (footnote omitted). The court concluded that the determination of when a patient's emergency medical condition no longer required immediate medical attention is "a material issue of fact." *Id.* at 99, 887 P.2d at 629. Because the matter had been decided as a result of a motion for summary judgment, *id.* at 97, 887 P.2d at 627, the court remanded the case for a hearing to determine when the emergency condition ended.[4] *Id.* at 99, 887 P.2d at 629.

---

[4] In these cases, unlike in *Mercy Healthcare,* a full administrative hearing before an administrative law judge was conducted during which the facts relevant to the determination of whether an emergency medical condition persisted could be ascertained.

9

¶15     Because of the procedural posture of the case, *Mercy Healthcare* did not fully develop a test to determine when a patient no longer is receiving emergency care but instead is receiving long-term care.  *Greenery* did set forth such a test.

¶16     In *Greenery,* the patients had "long-term debilitating conditions requiring ongoing care and daily attention."  150 F.3d at 228.  The Second Circuit held that the statute was not meant to cover conditions requiring "ongoing and regimented care."  *Id*. at 233.[5]  The court concluded that once "the patients were stabilized and the risk of further direct harm from their injuries was essentially eliminated, the medical emergencies ended."  *Id*. at 232.

¶17     *Greenery* reasoned that because the statute used the verb *manifesting* "in the present progressive tense . . . the statute plainly requires that the acute indications of injury or illness must coincide in time with the emergency medical condition."  *Id*. at 232.  Thus, "emergency medical conditions are sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm."  *Id*.  Applying this test to the

---

[5]     The patients in *Greenery* had been transferred to an out-of-state facility specializing in nursing and rehabilitative care for persons with brain injuries.  150 F.3d at 228.  Greenery Rehabilitation was seeking Medicaid reimbursement for medical care provided to three patients in their nursing facilities.  *Id.* at 228-29.  Each of those patients had a serious brain injury and had been under Greenery's constant care for more than three years.  *Id.*

medical conditions of the patients in that case, the court acknowledged that the patients' initial injuries "undoubtedly satisfied the plain meaning of [§ 1903(v)]." *Id*. But the court held that once those patients' initial conditions had stabilized, the emergency medical conditions had ended. *Id*. Consequently, the subsequent "long-term nursing and maintenance care" the patients received was not care for an emergency medical condition. *Id*. at 233.

¶18        In *Scottsdale Healthcare*, the court of appeals relied heavily on *Greenery* in interpreting A.R.S section 36-2905.05(A) and § 1903(v).  202 Ariz. at 368, ¶ 8, 45 P.3d at 691.  *Scottsdale Healthcare* agreed with the concept that once a patient was "stabilized," any care the patient subsequently received was not for an emergency medical condition.  *Id*. at 368-69, ¶¶ 9-10, 45 P.3d at 691-92.  The court found *Mercy Healthcare* distinguishable because "a factual dispute existed [there] as to when the patient no longer required immediate medical attention." *Id*. at 369, ¶ 13, 45 P.3d at 692.  The *Scottsdale Healthcare* court emphasized the patient in that case, J.N., "was medically stable." *Id*.

¶19        But the court in *Mercy Healthcare* had rejected the notion that an emergency condition necessarily ends when a patient's initial condition has been stabilized.  181 Ariz. at 98, 887 P.2d at 628*.*  Rather, the court held that the determination of an "emergency medical condition" does not require that acute symptoms

11

continue, but only that the medical condition had initially manifested itself by an acute symptom, and that the patient's condition was such that the absence of immediate medical treatment for the initial condition could result in one of the three adverse consequences listed in the statute. *Id*. at 99, 887 P.2d at 629. Consequently, the holdings of *Mercy Healthcare* and *Greenery* conflict as to the importance stabilization of the patient's initial injury plays in deciding whether a patient suffers from an emergency medical condition.

¶20    *Greenery*'s reliance on stabilization does not find support in the plain language of the statute.[6] More importantly, we think reliance on the notion of stabilization, at least as

---

[6]    In contrast, whether a patient is stable enough to be transferred from one health care facility to another is a consideration under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which uses the same definition of "emergency medical condition" as § 1903(v) of the Social Security Act. *See* 42 U.S.C. § 1395dd(e)(1) (Supp. 2002). The concern under the EMTALA is a hospital's duty to treat patients coming to its emergency room. *Bryant v. Adventist Health Sys./West,* 289 F.3d 1162, 1165 (9th Cir. 2002). That statute discusses stabilization of the patient with reference to when a hospital may transfer a patient to another facility. *See* 42 U.S.C. § 1395dd(c) (Supp. 2002). However, § 1395dd does not indicate that an "emergency medical condition" is no longer present when a patient is stable. Under the EMTALA, "[t]he term 'stabilized' means, with respect to an emergency medical condition . . . that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B) (Supp. 2002). Thus under the EMTALA, a patient is "stabilized" if his or her condition will not materially deteriorate during the short time necessary to transfer the patient to another facility. But, under § 1903(v) of the Social Security Act, stabilization is not an express factor in determining whether an emergency medical condition exists.

12

applied in these cases, fails to account for either the wide variety of emergency conditions or patients' responses to treatment.

¶21    The patient in *Banner II* presents a clear example of the problem raised by focusing solely on the stabilization of the patient's initial injury as the measure of when an emergency medical condition has ended.  G.O. had suffered a gunshot wound. The bullet struck a major artery, causing extensive blood loss, and injuring the patient's right kidney, appendix, and large and small intestines.  His treatment at the hospital lasted eleven months. After the first surgery, he had a large, gaping, leaking abdominal wound that required frequent dressing changes and additional surgeries.  He required tube feedings and continuous monitoring for infections and the development of fistulas.  During his stay at the hospital, G.O. was occasionally moved from an acute care bed to the hospital's sub-acute rehabilitation unit.  Of the 329 days G.O. spent in the hospital, AHCCCS refused payment for the approximately seventy-nine days G.O. spent in the rehabilitation unit.  In denying reimbursement for those seventy-nine days, AHCCCS reasoned that each time G.O. was moved off the acute care ward, or was stable enough to be moved, the emergency medical condition had ended.  However, the administrative law judge found that G.O.'s condition, even while on the rehabilitation ward, was such that he required and received life-sustaining, immediate medical treatment,

13

the denial of which would have been reasonably expected to place his health in serious jeopardy. Accordingly, although G.O.'s initial injury - the gunshot wound - may have been stabilized, his resulting condition arguably continued to manifest itself by acute symptoms of sufficient severity that he still required immediate medical attention to prevent placing his physical well-being in serious jeopardy.

¶22 Thus, as evidenced by G.O.'s stay in the hospital, a test that simply focuses on stabilization of the initial injury to determine when an emergency medical condition ends is impractical. Likewise, basing a decision of whether an emergency medical condition has ended on the type of ward on which the patient happens to be placed is similarly impractical. Neither the statute's plain language nor its intent contemplates that such a narrow, bright line distinction be drawn between what is an emergency condition and what is not. The realities of medical treatment and patients' responses to treatment do not lend themselves to such bright line distinctions. Instead, we conclude that even though an initial injury may be stabilized, that does not necessarily mean the emergency has ended.

¶23 To determine whether a patient suffers from an emergency medical condition under § 1903(v), the focus must be on the patient's current condition and whether that condition satisfies the criteria of § 1903(v). The statute first requires that the

14

medical condition be *manifesting* itself by acute symptoms.  We emphasize the verb manifesting because we agree with *Greenery* that the statute uses the present progressive tense of the verb to indicate that an emergency medical condition must be presently "revealing itself through acute indications" of injury or illness. *Greenery,* 150 F.3d at 232.  Second, § 1903(v) requires that these acute symptoms be sufficiently severe that "the absence of immediate medical attention" could reasonably be expected to place the patient's health in serious jeopardy, or serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

¶24     The key term is "acute," which denotes that the symptoms manifesting an emergency medical condition must not only have arisen rapidly, but, more importantly, that they be short-lived.[7] In other words, a medical condition manifesting itself by chronic symptoms[8] is not an emergency medical condition, even though the absence of medical care might lead to one of the three adverse consequences listed the statute.  Otherwise, AHCCCS would be responsible for "long-term" care, something *Mercy Healthcare* held was not contemplated by the statute.  181 Ariz. 98, 887 P.2d at

---

[7]     In medical terminology, acute refers to "a health effect, usually of rapid onset, brief, not prolonged; sometimes loosely used to mean severe." *Stedman's Medical Dictionary* 22 (27th ed. 2000).

[8]     Chronic refers to "a health related state, lasting a long time." *Stedman's Medical Dictionary* 348 (27th ed. 2000).

15

628.

¶25     Consequently, whether a patient suffers from an emergency medical condition does not depend upon the type of bed or facility the patient may be in at any given time.  In addition, stability, in the sense that a patient can be transferred from an acute care bed, is not the sole or even primary criterion under the statute.  Nor does the statute limit the determination of when an emergency medical condition has ended to whether "the treating physician has a reasonable degree of confidence that the patient and his lay caregivers can manage his medical condition so that serious adverse consequences are not 'reasonably likely' to occur," as urged by the hospitals.

¶26     Instead, the focus must be on whether the patient's current medical condition - whether it is the initial injury that led to admission, a condition directly resulting from that injury, or a wholly separate condition - is a non-chronic condition presently manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical treatment could result in one of the three adverse consequences listed in § 1903(v).[9]  If the resulting condition is manifested by chronic

---

[9]    Our formulation of the proper test for determining the presence of an emergency medical condition differs from that of the *Greenery* court.  We find *Greenery*'s focus on the stability of the patient, and the immediacy of treatment, too narrowly construes the statutory language.  *See* 150 F.3d at 32.  *Greenery* appears to imply an emergency medical condition exists only when an unstable patient requires constant care.  The statute, however, does not focus

16

symptoms it is not an emergency medical condition. Whether a condition is manifested by acute symptoms or by chronic symptoms is a question of fact. *See Mercy Healthcare*, 181 Ariz. at 99, 887 P.2d at 629. As discussed above, it is neither practical nor possible to define with more precision when an emergency medical condition has ended. Rather, such determinations should largely be informed by the expertise of health care providers.

## III.

¶27 We now turn to the resolution of these cases. Because the court of appeals applied a different test in these matters than the one we announce today, we must vacate those decisions. We remand these cases to the trial courts for a determination of whether the facts, as found by the administrative law judges, satisfy the test we have articulated to determine what constitutes an emergency medical condition as defined by § 1903(v). In applying the test we have set forth to these cases, the trial courts must defer to the facts found by the administrative law judges. *See, e.g., Nutek Info. Sys., Inc. v. Ariz. Corp. Comm'n*,

---

solely on the condition of the patient at one instant in time. Instead, § 1903(v) takes a forward looking view asking whether "the absence of immediate medical attention *could reasonably be expected* to result in" one of the three adverse consequences listed in the statute. The statute thus considers both the patient's current condition, that is whether the condition is presently manifested by acute symptoms, and how that current condition may affect the health of the patient in the days to come. Thus, the term "immediately" in the context of § 1903(v) contemplates a range of time frames, as opposed to some fixed standard.

194 Ariz. 104, 107, ¶ 14, 977 P.2d 826, 829 (App. 1998).  However, "[a]lthough an agency's interpretation of a statute . . . is entitled to great weight," *Golden Eagle Distribs., Inc. v. Ariz. Dep't of Econ. Sec.*, 180 Ariz. 565, 567, 885 P.2d 1130, 1132 (App. 1994), the trial court "determines whether [AHCCCS] properly interpreted the relevant law" in its application of the statute to the facts found by the administrative law judges.  *Id.; see also Gardiner v. Ariz. Dep't of Econ. Sec.*, 127 Ariz. 603, 606, 623 P.2d 33, 36 (App. 1980).

## IV.

¶28    We vacate the court of appeals' decisions in these cases, and remand the cases to the superior court for further proceedings consistent with this opinion.

¶29    In their supplemental brief, the hospitals request an award of attorneys' fees under A.R.S. section 12-348(A)(2) (2003).  The statute permits an award of fees to a party who has "prevail[ed] by an adjudication on the merits."  *Id.*  Because we have remanded these cases, the hospitals have not yet prevailed, making an award of fees premature.


_____
                        Michael D. Ryan, Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice

18

_____
Ruth V. McGregor, Vice Chief Justice



_____
Rebecca White Berch, Justice


Note: Justice Stanley G. Feldman sat for oral argument but retired prior to the filing of the opinion and therefore did not participate in the opinion.