No. 2-09-0581     Filed: 6-16-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

ELVIRA ARELLANO,                         )     Appeal from the Circuit Court
                                         )     of Winnebago County.
        Plaintiff-Appellant,             )
                                         )
v.                                       )     No. 08--MR--223
                                         )
THE DEPARTMENT OF HUMAN                   )
SERVICES, CAROL L. ADAMS, Secretary      )
of the Department of Human Services, and )
THE DEPARTMENT OF HEALTHCARE             )
AND FAMILY SERVICES,                     )     Honorable
                                         )     J. Edward Prochaska,
        Defendants-Appellees.            )     Judge, Presiding.

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Elvira Arellano, appeals from the ruling of the circuit court of Winnebago County affirming the decision of defendant, the Illinois Department of Human Services (the Department), denying her Medicaid benefits in connection with her hospitalization and treatment for pneumonia. (Plaintiff's complaint also named as defendants the Illinois Department of Healthcare and Family Services and Carol Adams, the Secretary of the Department.) The lone issue presented in this appeal is whether the medical services plaintiff received were in reaction to the "sudden onset" of an acute medical condition, so as to qualify her, an alien not lawfully admitted for permanent United States residence, for Medicaid benefits. However, for the reasons that follow, we conclude that the "sudden onset" requirement impermissibly modifies the Medicaid statute and thus cannot be enforced.

Accordingly, we vacate the Department's decision, which was premised on the "sudden onset" requirement, and remand with directions.

The record from the proceedings before the Department includes medical records from plaintiff's hospitalization as well as a transcript of plaintiff's testimony at a Department administrative hearing. That evidence contains various, and conflicting, descriptions of the timing and character of the symptoms that led to plaintiff's hospitalization.

In her testimony, plaintiff indicated that she visited a doctor a "few days" prior to her admission into the hospital.

A hospital record of plaintiff's history and physical, from May 7, 2006, the first day of her hospitalization, indicates that she went to the hospital complaining of shortness of breath. According to the medical record, plaintiff "state[d] that she was in [her] usual state of health until [the prior] evening around 11 o'clock when she went to bed. She had shortness of breath and the shortness of breath progressed and was no better, and she had trouble sleeping throughout the night so she came to the [hospital] *** in the morning." The report continued: "[Plaintiff] state[d] that she [had] been having a nonproductive cough starting about three weeks [prior] and overall the cough frequency and intensity [was] lessening."

A second May 7 history and physical report indicates that plaintiff (and the family members who accompanied her to the hospital and translated for her) "report[ed] that approximately two to three weeks ago [plaintiff] began feeling [ill] with shortness of breath as the princip[al] symptom. Over the ensu[]ing two weeks, [it] has gradually progressed and she first sought medical attention approximately three days ago at which time inhalers *** were prescribed. Over the weekend, there

was no improvement and thus the patient sought medical attention today [at the hospital] as her symptoms persisted and worsened."

A May 7 emergency-room report indicated that plaintiff "state[d] that since Friday [May 5] she has been feeling short of breath and saw her doctor that day. She state[d] she [had] gotten much worse since then."

The record of a May 10 pulmonary consultation indicated that the reason for the consult was that plaintiff was suffering from "diffuse lower lobe consolidation with hypoxemic respiratory failure and low grade fever, which reportedly began abruptly one day prior to her hospital admission on 5/7/2006, but was preceded by a three week history of nonproductive cough that apparently [had] improved."

The record of a May 13 infectious-disease consultation indicated as follows, in pertinent part:

"[Plaintiff] presented one week ago with respiratory distress. She is primarily Spanish-speaking. There was a translator in the room and, even with the translator, I had a hard time getting the patient down. At one point, she says that she became acutely ill a day or so prior to admission, with cough and shortness of breath. However, at another time, she will say that she noticed that she was getting winded a week or two before she came to the hospital, and it is really hard to pin her down as to which is the best description. As best I can tell, it sounds like a week or two before admission, she knew there was something different with maybe a little dyspnea [i.e., difficulty breathing] with exertion progressively, although no orthopnea [i.e., inability to breathe unless in an upright position], and then it got acutely worse just prior to admission."

The record of a May 10 rheumatology consultation stated as follows:

"[Plaintiff] was in her usual state of health until about three weeks ago when she started [to] have dyspnea on exertion and dry cough. She denied fever, but complained of upper back pain which had been going on for three years. Her symptoms got worse three days prior to admission to the point that she could not sleep the day before admission."

The same May 13 consultation record indicated that plaintiff reported having been in "excellent health" prior to the onset of her illness. The medical impression in the record indicated that plaintiff "presents with what sound[ed] like a two- to three-week lower respiratory course without fever but with a nonproductive cough, progressive dyspnea with exertion, and now dyspneic at rest."

Her discharge summary, produced on May 25, indicated that plaintiff "came to [the hospital] complaining of shortness of breath that [had] not been getting better. She [had] been having difficulty sleeping at night and she [had] also been complaining of a nonproductive cough which started approximately three weeks [prior to her hospitalization]. Her breathing [had] been getting progressively worse."

The records in total indicate that plaintiff was treated for pneumonia.

In her testimony, plaintiff said (through an interpreter) that her condition worsened just before she went to the hospital on May 7 (and in the days after she visited a doctor) and that she went to the hospital emergency room because she "had a high fever." She denied having had any difficulty sleeping the night before she went to the hospital. When asked whether she experienced difficulty breathing before she went to the hospital, plaintiff stated that "when she got up she felt like she was going to fall." When asked to clarify when her symptoms began, in light of medical records saying that she had experienced shortness of breath two to three weeks before she went to the hospital, plaintiff answered that "it's been three months," and, in response to a follow-up question, she agreed

that she was referring to three months before she went to the hospital. When asked if she had sought medical attention before she went to the hospital, she said that she went to the doctor "like two, three weeks before" she went to the hospital. (Earlier in her testimony, she had indicated that she had seen the doctor a few days, not weeks, before her hospital admission.) Plaintiff explained that she had initially attributed her cough to a minor cold, and she agreed that she eventually went to the hospital when the symptoms worsened to the point that she could not tolerate them and realized she was suffering from something more than a cold.

The Department's client-assessment unit initially denied plaintiff benefits because plaintiff's cough had begun three weeks prior to her hospitalization and progressed thereafter and, thus, "did not occur suddenly and unexpectedly." In a second decision, the client-assessment unit stated that plaintiff's "symptoms had been present x 3 weeks prior to her admission [and] she could have likely been seen by her doctor *** before this [hospitalization] [a]dmission [and] a sudden acute life threatening condition was not demonstrated on admission. Therefore emergent need [was] not met."[1] In a third decision, the client-assessment unit noted that the records indicated that plaintiff's symptoms had progressed over three weeks before worsening and causing her to visit the hospital. Thus, the client-assessment unit again concluded that plaintiff's condition was "[n]ot emergent ***, sudden occurrence of condition is not noted." Plaintiff continued to pursue benefits and eventually obtained the Department decision she now appeals. (Her testimony was taken after the client-assessment unit

---

[1] When the client-assessment unit criticized plaintiff for not having visited a doctor prior to her hospitalization, it apparently overlooked the portions of her medical records indicating that she had in fact visited a doctor in the days before her hospitalization.

decisions but before the Department decision.) That Department decision held as follows, in pertinent part:

> "In order to receive Emergency Medical Assistance, an ineligible non citizen must have a medical condition that occurs suddenly and unexpectedly. The record shows that [plaintiff] had been experiencing a progression of symptoms for at least three weeks before she sought treatment at the hospital. Accordingly, the record shows [plaintiff's] medical condition did not occur suddenly and unexpectedly *** in order to be eligible for Emergency Medical Assistance. Accordingly, the decision of [the client-assessment unit] that [plaintiff] was not eligible for Emergency Medical Assistance will be upheld."

On administrative review, the circuit court noted the discrepancies in plaintiff's medical records regarding the timing and nature of her symptoms but upheld the Department's decision, on the ground that the record "as a whole" supported the Department's ruling that her condition had not occurred suddenly and thus the Department's ruling was not clearly erroneous. Plaintiff timely appeals.

As the parties observe, the Department is an administrative agency, and, therefore, judicial review of its decisions is governed by the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2008)). The subject of our review is the agency's final determination, not that of the circuit court (Vincent v. Department of Human Services, 392 Ill. App. 3d 88, 93 (2009)), and our review extends to all questions of law and fact presented in the administrative record (735 ILCS 5/3--110 (West 2008)). For any given issue, our standard of review, which embodies the level of deference we afford the agency on that issue, depends on whether the issue is one of fact, one of law, or a mixed question of law and fact within the agency's area of expertise. AFM Messenger Service, Inc.

v. Department of Employment Security, 198 Ill. 2d 380, 390 (2001). A reviewing court affords to an agency no deference on questions of law, and it will therefore consider de novo any legal issues raised in an administrative appeal. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205 (1998). An administrative agency's findings of fact, on the other hand, are deemed to be prima facie true and correct and will not be upset unless they are against the manifest weight of the evidence. City of Belvidere, 181 Ill. 2d at 204, citing 735 ILCS 5/3--110 (West 1994). An agency's resolutions of mixed questions of law and fact--those issues for which the historical facts are established and the rule of law undisputed, so that the only question is whether the facts satisfy a statutory standard or whether as applied to the facts the rule of law is violated--will not be overturned on review unless clearly erroneous. AFM Messenger, 198 Ill. 2d at 391. The supreme court adopted this "clearly erroneous" standard of review, and this "mixed question of law and fact" category, in order to allow deference to agencies on matters within their expertise when review otherwise would have been de novo. See City of Belvidere, 181 Ill. 2d at 205 ("we find that the applicable standard of review should be between a manifest weight of the evidence standard and a de novo standard so as to provide some deference to the Board's experience and expertise").

The current case raises a question of law regarding what legal standard governs plaintiff's entitlement to benefits, factual questions regarding the timing and nature of her symptoms, and a mixed question of whether, given the resolution of the legal and factual questions, she met the legal standard.

We begin with the legal issue. In 1965, title XIX of the Social Security Act (42 U.S.C. §§1396 through 1396v (1994)) established Medicaid, "a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program."

Greenery Rehabilitation Group, Inc. v. Hammon, 150 F.3d 226, 227 (2d Cir. 1998). To participate in the federal Medicaid program, states must "abide by federal statutory law governing Medicaid reimbursement" or "risk losing Medicaid reimbursement from the federal government for that payment." Diaz v. Division of Social Services, 360 N.C. 384, 386, 628 S.E.2d 1,3 (2006).

When it was passed in 1965, the Medicaid statute was silent as to whether it provided benefits to undocumented aliens. Lewis v. Thompson, 252 F.3d 567, 571 (2d Cir. 2001). However, in 1986, in response to a federal court ruling that denial of Medicaid coverage to an illegal alien violated the Medicaid statute (see Lewis v. Gross, 663 F. Supp. 1164 (E.D.N.Y. 1986)), Congress incorporated restrictions on benefits to aliens, via the Omnibus Budget Reconciliation Act of 1986 (OBRA 1986) (Pub. L. No. 99--509, 100 Stat. 1874 (1986)). See Lewis, 252 F.3d at 573-74. Pursuant to OBRA 1986, the Medicaid statute now provides, with two exceptions, that "no payment may be made to a State [under Medicaid] for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. §1396b(v)(1) (2006). The policy underlying this provision of OBRA 1986 has been explained as attempting to serve both " 'a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits' " (Diaz, 360 N.C. at 390, 628 S.E.2d at 5, quoting 8 U.S.C. §1601(6) (2000)) and "the clear purpose *** to make government more cost-effective" (Lewis, 252 F.3d at 576). The parties agree that plaintiff was an alien not lawfully admitted for permanent residence in the United States, so that the above provision prohibits her from receiving benefits unless one of its exceptions applies.

The first exception to the above provision, that it does not apply to children and pregnant women lawfully residing in the United States (Pub. L. No. 111--3, 2009 U.S.C.C.A.N. (123 Stat.)

56 (to be codified at 42 U.S.C. §1396b(v)(4))), is not relevant here. The second exception provides as follows:

"(2) Payment shall be made under this section for care and services that are furnished to an alien *** only if--

(A) such care and services are necessary for the treatment of an emergency medical condition of the alien,

(B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this subchapter ***, and

(C) such care and services are not related to an organ transplant procedure.

(3) For purposes of this subsection, the term 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part." 42 U.S.C. §§ 1396b(v)(2), (v)(3) (2006).

The corollary federal and Illinois regulations contain similar provisions, albeit both with the addition of the phrase "sudden onset." The federal regulation provides as follows:

"(c) *** [A]liens who are not lawfully admitted for permanent residence in the United States or permanently residing in the United States under the color of law must receive the services necessary to treat the condition defined in paragraph (1) of this section if--

(1) The alien has, after sudden onset, a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:

(I) Placing the patient's health in serious jeopardy;

(ii) Serious impairment to bodily functions; or

(iii) Serious dysfunction of any bodily organ or part, and

(2) The alien otherwise meets the requirements [contained elsewhere in the federal regulations]." 42 C.F.R. §440.255(c) (2006).

The Illinois regulation provides as follows:

"Notwithstanding [the regulation's general ban on assistance to non-citizens], any non-citizen is eligible for medical assistance if the non-citizen otherwise meets the income, asset and categorical requirements of the medical assistance program and is in need of emergency services required after the sudden onset of a medical condition (including labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in:

A) placing the non-citizen's health in serious jeopardy;

B) serious impairments of bodily functions; or

C) serious dysfunction of any organ or part (42 USC [§]1396[b](v)." 89 Ill. Adm. Code §120.310(b)(3), amended at 29 Ill. Reg. 939, 14939, 14956, eff. September 20, 2005.

The parties agree that the only explicit basis for the Department's decision was its finding that plaintiff's condition did not satisfy the "sudden onset" requirement contained in the federal and Illinois regulations. Therefore, in order to gauge the propriety of the Department's decision, we will consider only the "sudden onset" requirement from the above regulations, and not the remaining requirements for eligibility.

In order to settle the parties' dispute regarding the "sudden onset" requirement, we must first interpret the meaning of the phrase. The parties agree that the limited case law interpreting OBRA 1986 does not address the "sudden onset" requirement but instead addresses the duration of treatment covered for admittedly emergency conditions or addresses other components of the definition of "emergency medical condition." See Greenery Rehabilitation Group, Inc. v. Hammon, 893 F. Supp. 1195 (N.D.N.Y. 1995), rev'd, 150 F.3d 226 (7th Cir. 1998) (ongoing care of chronic conditions does not qualify for coverage); Scottsdale Healthcare, Inc. v. Arizona Health Care Cost Containment System Administration, 206 Ariz. 1, 75 P.3d 91 (2003) (same); Mercy Healthcare Arizona, Inc. v. Arizona Health Care Cost Containment System, 181 Ariz. 95, 887 P.2d 625 (App. 1994) (coverage continues after stabilization, until patient no longer requires immediate care to avoid serious harm); Szewczyk v. Department of Social Services, 77 Conn. App. 38, 822 A.2d 957 (2003), rev'd, 275 Conn. 464, 881 A.2d 259 (2005) (same); Diaz v. Division of Social Services, 166 N.C. App. 209, 600 S.E.2d 877 (2004), rev'd, 360 N.C. 384, 628 S.E.2d 1 (2006) (medical emergency ends when patient's condition is stabilized); Medina v. Division of Social Services, 165 N.C. App. 502, 598 S.E.2d 707 (2004) (continued care is covered so long as patient's condition manifests itself by acute symptoms and immediate medical treatment is required to prevent serious harm); Luna v. Division of Social Services, 162 N.C. App. 1, 589 S.E.2d 917 (2004) (same); see also Quiceno v. Department

of Social Services, 45 Conn. Supp. 580, 728 A.2d 553 (Super. Ct. 1999) (ongoing treatment of chronic conditions not covered); Norwood Hospital v. Commissioner of Public Welfare, 417 Mass. 54, 627 N.E.2d 914 (1994) (no coverage for chronic condition where there was no immediate danger of serious harm). Accordingly, while we have consulted those cases for useful background on OBRA 1986 and related laws, we must independently undertake the task of interpreting the phrase "sudden onset" in the current context.

As we note above, the federal and Illinois regulations include the phrase "sudden onset" to define the type of "emergency medical conditions" for which Medicaid covers treatment for undocumented aliens, but OBRA 1986 does not. We must therefore interpret the regulations.[2] A court will interpret an administrative regulation in the same manner as it would interpret a statute. First National Bank of Chicago v. Standard Bank & Trust, 172 F.3d 472, 476 (7th Cir. 1999); Union Electric Co. v. Department of Revenue, 136 Ill. 2d 385, 391 (1990). Thus, our primary aim is to give effect to the drafters' intent, and the best indicator of that intent is the regulations' language, given its plain and ordinary meaning. Nolan v. Hillard, 309 Ill. App. 3d 129, 143 (1999); see Ioffe v. Skokie Motor Sales, Inc., 414 F.3d 708, 710-11 (7th Cir. 2005) (inquiry into meaning of statute and regulation must begin by reviewing their plain language).

The import of the phrase "sudden onset" is not immediately clear from the plain language of the regulations. The word "sudden" can refer, among other things, to "an unexpected occurrence"

---

[2]Because there is no appreciable difference between the federal and Illinois regulations' use of the phrase "sudden onset," and because the Illinois regulation must in any event follow the federal law in order for Illinois to qualify for Medicaid reimbursement, we draw no distinction between the federal and state regulations for purposes of our interpretation.

or emergency, or a happening "without previous notice." Webster's Third New International Dictionary 2284 (1986). Under this definition, the phrase "sudden onset" adds a restriction to the type of "emergency medical conditions" for which Medicaid covers treatment. See Arizona Health Care Cost Containment System Administration v. Carondelet Health System, 188 Ariz. 266, 270, 935 P.2d 844, 848 (App. 1997) (explaining that a state regulation that added a "sudden onset" requirement to a state statute providing benefits for "emergency medical care" restricted the meaning of "emergency medical care").

Such an interpretation would violate the rule that a court avoid reading regulations in a way that brings them into conflict with statutory or constitutional law. Robbins v. Bentsen, 41 F.3d 1195, 1198-99 (7th Cir. 1994); Northern Illinois Automotive Wreckers & Rebuilders Ass'n v. Dixon, 75 Ill. 2d 53, 59-60 (1979). An administrative agency delegated rulemaking authority has no power to make law, but instead is limited to creating rules to effectuate the will of the legislature as expressed in the relevant statute. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 47 L. Ed. 2d 668, 688, 96 S. Ct. 1375, 1391 (1976); Dixon, 75 Ill. 2d at 60 ("a statute may not be altered or added to by the exercise of a power to make rules thereunder"); Peerless Wholesale Liquors, Inc. v. Illinois Liquor Control Comm'n, 296 Ill. App. 3d 230, 235 (1998) ("Administrative rules cannot be read to limit or extend the scope of a statute"). Here, the OBRA 1986 statute, which the regulations were promulgated to implement, requires that "[p]ayment shall be made *** for care and services that are furnished to an alien *** if *** such care and services are necessary for the treatment of an emergency medical condition of the alien." 42 U.S.C. §1396b(v)(2)(A) (2006). OBRA 1986 contains no limitation that the emergency medical condition must also have had a "sudden onset." OBRA 1986 also provides a specific definition of the phrase "emergency medical condition" (42

U.S.C. §1396b(v)(3) (2006)), and that definition does not include any requirement that the condition have had a "sudden onset." Both the federal and the Illinois regulations repeat and incorporate the OBRA 1986 definition of "emergency medical condition," but both also add just before that definition that the "medical condition" covered must also have had a "sudden onset." See 42 C.F.R. §440.255(c) (2006) (beginning the exception by stating, "[t]he alien has, after sudden onset, a medical condition," before repeating the Medicaid statute's definition of an emergency medical condition); 89 Ill. Adm. Code §120.310(b), amended at 29 Ill. Reg. 14939, 14956, eff. September 20, 2005 (same). The maxim that, where possible, a court must interpret a regulation to be valid and not to conflict with statutory law dictates that we not interpret the regulations' use of the phrase "sudden onset" as adding a limitation on Medicaid benefits not contained in OBRA 1986.

On the other hand, we could avoid this problem by interpreting the phrase "sudden onset" as redundant with Medicaid's requirement that the treatment for which reimbursement is sought be for an "emergency medical condition" whose symptoms are "acute." See Greenery, 150 F.3d at 232 (reasoning that the term "emergency" denotes a " 'sudden' " event and that the term "acute" describes a symptom with " 'a sudden onset' "), quoting Webster's Third New International Dictionary 23, 741 (1981); Szewczyk v. Department of Social Services, 275 Conn. 464, 511, 881 A.2d 259, 288 (2005) (Sullivan, C.J., joined by Zarella, J., dissenting) ("[t]he injury is acute in the sense that it was of sudden onset and is severe"); see also Webster's Third New International Dictionary 23 (1986) (defining "acute" as a medical term used to describe a condition with "sharpness or severity" or having "a sudden onset, sharp rise, and short course"). This solution, however, carries its own problem: it requires that we violate the maxim that a court should avoid interpreting statutory or

regulatory language in a way that renders it superfluous. Gillespie v. Trans Union, LLC, 433 F. Supp. 2d 908, 913 (N.D. Ill. 2006); Gaston v. CHAC, Inc., 375 Ill. App. 3d 16, 45 (2007).

Based on the above discussion, we conclude that the regulations' plain language is ambiguous on the proper interpretation to be accorded the phrase "sudden onset," and we continue our interpretation by consulting the relevant legislative and regulatory history. That history provides a very clear picture of the intent underlying the inclusion of the "sudden onset" phrase in the regulations.

The federal Department of Health and Human Services added the "sudden onset" requirement to the federal regulations in 1990, in order to implement changes made by OBRA 1986. See 55 Fed. Reg. 36813 (September 7, 1990) (to be codified at 42 C.F.R. pt. 435, 436, 440). When the rules were published, in response to comments that "the definition of emergency medical condition should be expanded and more precisely defined," the Department of Health and Human Services stated as follows:

"[W]e have revised the definition of emergency medical services to say that 'after the sudden onset of a medical condition ***.' This change will make the definition of emergency services consistent with the definition already in use in the Medicaid program at 42 C.F.R. 447.53(b)(4) and with the definition contained in section 1867(e)(1) of the [Social Security Act], relating to hospital emergency departments['] inappropriate failure to treat certain patients (the anti-dumping provision)." 55 Fed. Reg. 36816 (September 7, 1990) (to be codified at 42 C.F.R. pt. 435, 436, 440).

This passage indicates that the phrase "sudden onset" was added to the federal regulations in order to mirror two laws separate from, but related to, the OBRA 1986 provisions for treatment of undocumented aliens. We therefore examine both of those laws.

We first examine section 1867 of the Social Security Act, codified at 42 U.S.C. §1395dd and better known as the Emergency Medical Treatment and Active Labor Act (EMTALA). EMTALA prohibits hospitals from rejecting patients suffering from emergency medical conditions without first stabilizing or transferring the patients. See 42 U.S.C. §1395dd(b) (2006). Save for inconsequential variations in punctuation and the nomenclature used to identify the patient, EMTALA's definition of the phrase "emergency medical condition" is precisely the same as that contained in the Medicaid statute's undocumented-alien provisions. See 42 U.S.C. §1395dd(e)(1) (2006). EMTALA's definition of "emergency medical condition" contains no qualifier that the condition must have had a "sudden onset." Thus, despite the statement from the Department of Health and Human Services, EMTALA cannot have inspired its inclusion of the phrase "sudden onset" in the federal regulation at issue here.

The second law cited by the Department of Health and Human Services, 42 C.F.R. §447.53(b)(4), is a regulation promulgated to implement 42 U.S.C. §1396o, a section of the Medicaid statute governing cost-sharing charges for certain patients. See Pharmaceutical Society of the State of New York v. New York State Department of Social Services, 50 F.3d 1168, 1170 (2d Cir. 1995) (citing both). 42 C.F.R. §447.53(b)(4) (hereinafter, the Cost Sharing Regulation) does indeed use the phrase "sudden onset." In fact, the Cost Sharing Regulation uses precisely the same language as the federal regulation now at issue:

"Emergency services. Services provided in a hospital, clinic, office, or other facility that is equipped to furnish the required care, after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in--

(I) Placing the patient's health in serious jeopardy;

(ii) Serious impairments to bodily functions; or

(iii) Serious dysfunction of any bodily organ or part." (Emphases added.) 42 C.F.R. §447.53(b)(4) (2006).

Thus, it appears that the Cost Sharing Regulation served as the model for the regulation we now interpret, 42 C.F.R. §440.255(c). This revelation raises two important points.

First, as we have said, the Cost Sharing Regulation was promulgated to implement 42 U.S.C. §1396o. That statute provides no definition of the phrase "emergency services"; instead, it expressly states that the phrase "emergency services" is to be "defined by the Secretary" (i.e., defined by an agency and not the legislature). 42 U.S.C. §1396o(a)(2)(D) (2006). Here, on the other hand, the relevant statute fully defines the phrase "emergency medical condition" and explicitly states that coverage shall extend for the care of such conditions. Thus, a "sudden onset" requirement that may have been appropriate (and consistent with the enabling statute) in the context of the Cost Sharing Regulation is not necessarily so in the context of section 440.255(c).[3]

_____

[3]After we directed the parties to be prepared to discuss at oral argument the legislative and administrative history informing this case, the Department filed a motion for leave to cite Chevron, U.S.A. Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837, 843, 81 L. Ed. 2d 694, 703, 104 S. Ct. 2778, 2782 (1984), as additional authority, for the proposition that, "if [a] statute is silent

Second, the Cost Sharing Regulation was promulgated in 1985 (see 50 Fed. Reg. 23009 (May 30, 1985) (to be codified at 42 C.F.R. pt. 431, 447)), before Congress passed EMTALA in 1986 (see Pub. L. 99--272 §9121(b), 100 Stat. 164, 165 (1986)). "[EMTALA's] definition of emergency medical condition contained language substantially similar to the language of [the Cost Sharing Regulation], with the exception that the statute did not list the facilities at which emergency medical services must be provided or include a sudden onset requirement." Szewczyk, 275 Conn. at 495-96, 881 A.2d at 279 (Sullivan, C.J., joined by Zarella, J., dissenting). We cannot attribute to inadvertence Congress's decision to exclude specifically from EMTALA the "sudden onset" requirement when it otherwise adopted virtually wholesale the remainder of the Cost Sharing Regulation. Rather, we must conclude that when Congress specifically excised "sudden onset" from regulatory language it otherwise adopted unchanged, it intended that "sudden onset" not be made a requirement for a condition to qualify as an "emergency medical condition" under EMTALA. The amendment to the Medicaid statute excluding undocumented aliens was passed after EMTALA and, as we have stated, uses EMTALA's definition of "emergency medical condition." When it copied EMTALA's definition of "emergency medical condition," Congress necessarily repeated its implicit rejection of the "sudden onset" language.

-------

or ambiguous with respect to [a] specific issue," a court should defer to an agency's interpretation of the statute, so long as that interpretation is reasonable. We hereby allow the motion to cite additional authority, but we decline to apply so-called Chevron deference to the statute and regulations at issue here because Congress did not leave vague or ambiguous its definition of "emergency medical condition." It specifically provided a definition of the term without the qualifier the regulations added.

Thus, the legislative history and the history behind section 440.255(c), the federal regulation now at issue, indicate (1) that Congress intended to exclude from the Medicaid statute's definition of "emergency medical conditions" the Cost Sharing Regulation's "sudden onset" limitation, and (2) that the "sudden onset" requirement was added to section 440.255(c) to include the Cost Sharing Regulation's "sudden onset" limitation. Accordingly, although we have a duty to construe a regulation as consistent with the law wherever possible, we must conclude that such a construction is not possible here. Based on the history underlying section 440.255(c), we conclude that its "sudden onset" requirement improperly restricts and contravenes the Medicaid statute, and we therefore cannot enforce it.

In so holding, we observe that the Department objects to any reliance on EMTALA to interpret OBRA 1986, because, according to the Department, the purpose underlying EMTALA (preventing patient "dumping" by hospitals) differs from those underlying OBRA 1986 (to save costs and discourage illegal immigration). We further note that the level of care mandated under EMTALA might differ from that mandated under OBRA 1986: EMTALA requires only that a patient's emergency medical condition be "stabilize[d]" (42 U.S.C. §1395dd(b)(1) (2006)), while OBRA 1986 requires that an undocumented alien receive coverage for "treatment" of an emergency medical condition (42 U.S.C. §1396b(v)(2)(A) (2006)). See Scottsdale Healthcare, Inc., 206 Ariz. at 7 n.6, 75 P.3d at 97 n.6 (contrasting the dictates of EMTALA with OBRA 1986). However, while these differences between EMTALA and OBRA 1986 might be instructive in other contexts (such as the question of the extent and duration of treatment covered under either law), it does not alter the fact that the legislative history underlying OBRA 1986 includes EMTALA and excludes the phrase "sudden onset."

At oral argument, the Department added the argument that we should rely on the principle of legislative acquiescence to uphold the regulations' "sudden onset" requirement. The principle of acquiescence, described by our supreme court as a " 'weak reed on which to base a determination of *** drafters' intent' " (People v. Marker, 233 Ill. 2d 158, 175 (2009), quoting People v. Marker, 382 Ill. App. 3d 464, 490 (2008) (O'Malley, J., dissenting)), holds that, where judicial interpretation of a statute has not evoked an amendment to the statute, the drafters are presumed to have acquiesced, and thus ratified, courts' interpretation of the statute (Marker, 233 Ill. 2d at 178, citing People v. Downs, 371 Ill. App. 3d 1187, 1191 (2007)). According to the Department, the fact that the regulations' "sudden onset" requirement has long persisted without any correction from Congress indicates that Congress has acquiesced to the requirement. The difficulty with the Department's theory is that, by the Department's own admission, there is no case law addressing the propriety of the "sudden onset" requirement, much less any case law endorsing it. Thus, Congress has been presented with no judicial rulings in which to acquiesce.

Even though it acknowledges that Congress has seen no case law directly on point, the Department argues that the Second Circuit's decision in Greenery, although directed at a different point, relied on the assumption that a "sudden onset" requirement was included in the Medicaid statute. We agree with the Department's reading of Greenery as assuming a "sudden onset" requirement to be a part of the Medicaid statute, but we disagree with the Department's conclusion that that assumption, coupled with Congress' failure to respond, is sufficient to trigger the principle of legislative acquiescence.

As we say above, Greenery is among the several decisions that struggled to determine whether section 1396b(v)(3) covers treatment for chronic or ongoing conditions; the parties assumed that the

patients' treatment was covered upon their initial hospitalization. Greenery, 150 F.3d at 231 ("The question is simply whether chronic debilitating conditions that result from sudden and serious injuries *** are 'emergency medical conditions' as provided under §1396b(v)(3)"). The Second Circuit reasoned that treatment for chronic conditions was not covered, because the phrases "emergency medical condition" and "acute" "unambiguously convey[ed] the meaning that emergency medical conditions are sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm." Greenery, 150 F.3d at 232. Although the Second Circuit included suddenness among the components of its definition of "emergency medical conditions," it did not focus, or rely, on any suddenness requirement; it instead relied on the "short-lived" and "immediate medical treatment" components of its definition to reach its holding that ongoing treatment for chronic conditions is not covered. We do not construe this mention of suddenness, which the Second Circuit neither extrapolated nor relied on, to be the type of judicial statement that would precipitate a reaction from Congress regarding the "sudden onset" requirement contained in the Medicaid regulation. We therefore reject the Department's contention that the principle of acquiescence dictates that we uphold the "sudden onset" requirement contained in the regulation.[4]

_____

[4]Further, based on the legislative and regulatory history we discuss above, we disagree with the Greenery court's conclusion that Congress meant the terms "emergency medical condition" and "acute" to require that the onset of a condition covered by Medicaid be "sudden." If Congress indeed intended to require that a condition be sudden in order for its treatment to be covered under section 1396b(v)(3), it would not have excised the "sudden onset" language from the language it otherwise adopted in section 1396b(v)(3).

-21-

Because we conclude that we cannot enforce any "sudden onset" requirement related to OBRA 1986, we also conclude that the Department employed an incorrect legal standard when it rejected plaintiff's claim due to her failure to meet a "sudden onset" requirement. The question remains whether plaintiff's condition otherwise qualified as an "emergency medical condition." The Department's findings of fact, which were directed entirely at the "sudden onset" requirement, do not address this issue. Likewise, the Department's application of law to the facts was based on the improper "sudden onset" requirement and did not address whether plaintiff's condition otherwise qualified as an "emergency medical condition." We therefore have no basis on which to affirm the Department's decision. Indeed, in its brief, the Department does not urge any basis to affirm other than the "sudden onset" requirement we have held to be improper.

In sum, the "sudden onset" requirement was the exclusive basis for the Department's decision. It entered no findings on any of the other possible bases for denying plaintiff's claim, and it of course has had no opportunity to apply the correct legal standard (with no "sudden onset" requirement) to the facts of this case. We therefore vacate the Department's decision and remand the case for consideration under the legal standard articulated herein.

Vacated and remanded with directions.

JORGENSEN and HUDSON, JJ., concur.